**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |  |
|---|---|---|
| Sarah G., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:25-cv-00576-AEM |
| | ) | |
| Frank Bisignano, Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

AMY E. MOSES, United States Magistrate Judge.

Plaintiff Sarah is a 50-year-old woman who worked for many years as a plumber and pipefitter.  ECF No. 6 at 56-58.  She persisted in this labor-intensive profession despite suffering from fibromyalgia, chronic migraines, anxiety, depression, and post-traumatic stress disorder ("PTSD").  *Id.* at 24, 61-62.  After she stopped working as a plumber, she attempted to maintain employment as a plumbing instructor and later as a part-time, self-taught web developer, until her symptoms forced her to stop working altogether in 2022.  *Id.* at 52-55.  Prior to the onset of her chronic pain and other debilitating symptoms, Sarah enjoyed cycling, kayaking, hiking, and yoga and was an avid knitter.  *Id.* at 330, 332.

Sarah applied for Social Security Disability Insurance ("SSDI") on March 22, 2023.  *Id.* at 22.  The Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") denied her claim under the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  *Id.* at 22-35.

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. Based on my review of the record, the parties' submissions, and independent research, I find that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and, as such, is remanded for further consideration.

## I.  BACKGROUND

### A.  Procedural History

Sarah's application for SSDI was denied initially on November 9, 2023 (ECF No. 6 at 123-26) and on reconsideration on December 19, 2023 (*id.* at 135-37). Sarah requested an Administrative Hearing that was held on June 25, 2024 before ALJ Paul Goodale. *Id.* at 41-91. At the hearing, Sarah was represented by counsel and testified, and Vocational Expert ("VE") Edmond Calandra testified as well. *Id.* The ALJ issued a decision unfavorable to Sarah on September 27, 2024 (*id.* at 19-35) and the Appeals Council denied Sarah's request for review on August 28, 2025 (*id.* at 6-8). Sarah timely appealed by filing her Complaint on November 1, 2025, seeking to reverse the decision of the Commissioner. ECF No. 1. On March 13, 2026, Sarah filed Plaintiff's Motion to Reverse the Decision of the Commissioner. ECF No. 10. On April 8, 2026, the Commissioner filed Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12), and on April 22, 2026, Sarah filed Plaintiff's Reply. ECF No. 13.

### B.  ALJ Decision

The ALJ follows a five-step process in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof at Steps One through Four, and the Commissioner bears the burden at Step Five. *See Wells v. Barnhart*, 267 F. Supp. 2d 138, 144 (D. Mass. 2003). The Court recounts below only the steps implicated in Sarah's appeal.

At Step Two of the analysis, the ALJ found that Sarah's fibromyalgia, migraines, depressive disorder, anxiety disorder, and PTSD were severe medically determinable impairments ("MDIs").  ECF No. 6 at 24-25.  Considering these impairments, the ALJ determined that Sarah had the Residual Functional Capacity ("RFC")[1] to perform a limited range of light work.[2]  *Id.* at 27.  The RFC contained additional limitations:  Sarah can stand and/or walk for up to four hours in an eight-hour work day; can do one- to three-step tasks in a routine setting involving no more than occasional changes in a work setting; can do individual table or bench work; can occasionally stoop, crouch, crawl, and kneel; can frequently balance, climb ramps and stairs, and handle and finger bilaterally; cannot climb ladders, ropes, or scaffolds or do production rate or pace work; and can have occasional contact with the public and frequent but superficial contact with coworkers. *Id.*

In formulating the RFC, the ALJ considered Sarah's description of her fibromyalgia symptoms and concluded that her "statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 28.  The ALJ noted that Sarah testified that she experienced "a lack of energy, endurance, and physical strength" as well as chronic pain that "affected her ability to use her hands" and joint and muscle pain that made it difficult for her to go up stairs or get up from a chair, and nearly impossible for her to get up off the floor *Id.* at 27-28.  He cited to treatment notes

---

[1] RFC is "the most you can still do despite your limitations," considering "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

[2] Under 20 C.F.R. §§ 404.1567(b), 416.967(b), "light work" is work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

indicating that "symptoms attributed to fibromyalgia include widespread pain, dizziness/lightheadedness, fatigue, reduced endurance, and brain fog." *Id.* at 29.

The ALJ went on to detail that Sarah's providers "recommended conservative treatment"— including medication, aerobic exercise, optimizing depression and anxiety management, optimizing sleep hygiene, acupuncture, aquatic therapy, and yoga—that had "generally been effective in controlling her symptoms." *Id.* He noted that her fibromyalgia "responded well to medication," going off Gabapentin due to cognitive side effects and starting a low dose of Naltrexone, which she reported improved her brain fog and "helped somewhat with her myofascial pain and fatigue." *Id.* at 29-30. He further noted that she "regularly reported good symptom alleviation with physical therapy and dry needling." *Id.* at 30.

The ALJ evaluated objective findings in the record, specifying that physical therapy records and other treatment notes show reduced motion, painful flexion, general strength deficits, and tenderness to palpation in various areas. *Id.* He went on to explain, however, that "in general, treatment and exam findings show normal neurologic and musculoskeletal exam findings." *Id.* He remarked that Sarah's testimony regarding her hand limitations, dizziness, and lightheadedness were not supported by objective findings. *Id.* He similarly noted that her mental status examination findings were grossly normal, in contrast to her reports of "brain fog," difficulty falling asleep, fatigue, irritability, low motivation, and loss of pleasure, and that her mental health symptoms appeared to be well controlled with medication and routine treatment. *Id.* at 30-31.

Finally, the ALJ highlighted "inconsistencies between the record and claimant's subjective complaints." *Id.* at 32. The ALJ posited that although Sarah testified that she experienced extreme fatigue after minimal exertion, the record "show she engaged in exertional activities in excess of

4

the limits she described at the hearing," including working on her rental property, planning to help a friend with a plumbing project, and purchasing roller skates. *Id.*

Although the ALJ found that Sarah cannot perform any past relevant work as a plumber, plumbing instructor, or data entry clerk, he determined that she could do a significant number of other jobs in the national economy, including electric assembler, solderer, and small parts assembler. *Id.* at 33-35. The ALJ therefore concluded that Sarah is not disabled within the meaning of the Act. *Id.* at 35.

## II.    STANDARD OF REVIEW

The Court's role in reviewing the Commissioner's decision is limited. *Brown v. Apfel*, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), *aff'd*, 230 F.3d 1347 (1st Cir. 2000) (per curiam). The Court does not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner. *Thomas P. v. Kijakazi*, C.A. No. 21-00020-WES, 2022 WL 92651, at *8 (D.R.I. Jan. 10, 2022), *report and recommendation adopted by text order*, (D.R.I. Mar. 31, 2022). Where "the Commissioner's decision is supported by substantial evidence, the [C]ourt must affirm, even if the [C]ourt would have reached a contrary result as finder of fact." *Tegan S. v. Saul*, 546 F. Supp. 3d 162, 168 (D.R.I. 2021); *see Rodriguez Pagan v. Sec'y Health & Hum. Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The determination of substantiality is based on an evaluation of the record as a whole. *Frustaglia v. Sec'y Health & Hum. Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (per curiam); *Brown*, 71 F. Supp. 2d at 30. If the Court determines "that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the

Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g)." *Andrea T. v. Saul*, C.A. No. 19-505WES, 2020 WL 2115898, at *4 (D.R.I. May 4, 2020) (citing *Allen v. Colvin*, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015)).

In reviewing the Commissioner's decision, the Court must bear in mind that claimants "'are entitled to a broad construction of the Act. In practical terms, when a Social Security Act provision can be reasonably interpreted in favor of one seeking benefits, it should be so construed.'" *Ferguson v. Colvin*, 63 F. Supp. 3d 207, 211 (D.R.I. 2014) (quoting *Cunningham v. Harris*, 658 F.2d 239, 243 (4th Cir. 1981)). Moreover, the Court of Appeals for the First Circuit has stated that "courts should ensure 'a just outcome' in Social Security disability claims." *Santa v. Astrue*, 924 F. Supp. 2d 386, 391 (D.R.I. 2013) (quoting *Pelletier v. Sec'y Health, Educ. & Welfare*, 525 F.2d 158, 161 (1st Cir. 1975)).

### III.    ANALYSIS

Sarah notes that the ALJ dismissed her subjective testimony about her fibromyalgia symptoms based on objective findings, conservative treatment, normal exams, and response to medication. ECF No. 10 at 7-8. She argues that the ALJ's analysis both mischaracterized the record evidence and improperly relied on a lack of objective findings to substantiate her symptoms, and that the resulting decision is therefore not supported by substantial evidence. *Id.* at 7-10. The Government argues that the ALJ properly considered the entire record when determining Sarah's functional capacities, including her testimony, objective exam findings, evidence regarding Sarah's activity level, and her medication history. ECF No. 12 at 6-8.

Fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues." SSR 12-2p, 2012 WL 3104869, at *1 (Jul. 25, 2012). Diagnosis of fibromyalgia is difficult because "'musculoskeletal and neurological

6

examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities.'" *Johnson v. Astrue*, 597 F.3d 409, 410 (1st Cir. 2009) (quoting Dennis L. Kasper, et al., *Harrison's Principles of Internal Medicine* 2056 (16th ed. 2005)).  "'Unlike other medical conditions, [fibromyalgia] is not amenable to objective diagnosis and standard clinical tests are not highly relevant in diagnosing or assessing fibromyalgia or its severity.'"  *Tegan S.*, 546 F. Supp. 3d at 170 (quoting *Small v. Astrue*, 840 F. Supp. 2d 458, 464 (D. Mass. 2021).  Because of this, "'a patient's report of complaints, or history, is an essential diagnostic tool' in fibromyalgia cases." *Johnson*, 597 F.3d at 412 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)).

In response to the complexities of evaluating fibromyalgia, the Social Security Administration issued Social Security Ruling 12-2p ("SSR 12-2p"), a policy interpretation ruling entitled "Evaluation of Fibromyalgia."  2012 WL 3104869, at *1.  SSR 12-2p establishes a two-step process for evaluating a claimant's statements about her symptoms and functional limitations: (1) "There must be medical signs and findings that show the person has an MDI(s) which could reasonably be expected to produce the pain or other symptoms alleged," which can be satisfied if the ALJ determines that fibromyalgia is an MDI; and (2) "Once an MDI is established, we then evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work."  *Id.* at *5.  Further:

> If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

*Id.*  Considering SSR 12-2p and the unique challenges of evaluating fibromyalgia, this Court has articulated that "once a diagnosis of fibromyalgia is established, an ALJ has no choice but to conclude that the claimant suffered from the symptoms usually associated with such condition,

unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms." *Tegan S.*, 546 F. Supp. 3d at 169-70 (cleaned up).

The ALJ determined that Sarah's fibromyalgia constitutes a severe MDI, satisfying the first of SSR 12-2p's two steps. ECF No. 6 at 24-25. Where he erred, however, is at the second step in the analysis, when he evaluated Sarah's symptoms and determined the extent to which they limited her capacity for work. Contrary to the ALJ's findings, a review of the record as required by *Tegan S.* reveals that there is not substantial evidence to support that Sarah did not endure the fibromyalgia symptoms as alleged. *See* 546 F. Supp. 3d at 169-70.

First, the fact that Sarah's "treatment and exam findings show normal neurologic and musculoskeletal exam findings," ECF No. 6 at 30, is typical of a fibromyalgia patient and "not highly relevant" to assessing its severity. *See Tegan S.*, 546 F. Supp. 3d at 170. Pursuant to SSR 12-2p, because objective medical evidence does not substantiate Sarah's statements, the ALJ is to consider other evidence in the case record. 2012 WL 3104869, at *5. The ALJ cited Sarah's conservative treatment regimen; positive response to medication, physical therapy, and dry needling; and inconsistencies between Sarah's subjective complaints and her level of activity in determining that "her statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence in the record." ECF No. 6 at 28-30, 32.

The fact that Sarah's providers recommended "conservative treatment," such as physical therapy and aerobic exercise, does not discredit the severity of her symptoms: "The first problem with this reasoning is that this is the appropriate treatment for fibromyalgia." *Johnson*, 597 F.3d at 412. Furthermore, the record reveals that "good symptom alleviation" mischaracterizes Sarah's response to physical therapy and dry needling; while both treatments provided some relief, the

8

record also shows that these treatments were hard on Sarah and that she continued to experience pain. *Compare* ECF No. 6 at 644 (July 12, 2022 physical therapy note that Sarah "is continuing to report reduction in symptoms with current physical therapy intervention"), *with id.* at 659 (August 2, 2022 physical therapy note that "Sarah reports that she was very 'burned out' after last session. Hips were really sore and painful for the next couple days, up to Thursday. Shoulder[s] have been angry reaching behind"), *and id.* at 731 (November 22, 2022 physical therapy note that Sarah "felt fine after leaving last session but, now is much more fatigued and sore. [Left] collarbone and upper trap area is worse."); *compare id.* at 643 (July 12, 2022 physical therapy note that "Sarah reports that her knee has been feeling great and her neck and back/hips have been feeling better. . . . The [targeted dry needling] is 'amazing'"); *with id.* at 575 (August 23, 2022 New England Wellness Collaborative report that Sarah was "feeling overwhelmingly tired from recent physical therapy session, especially from dry needling treatment"), *and id.* at 855 (February 24, 2023 physical therapy note that "Sarah reports her hip and low back have been continuing to bother her, she has a baseline level of discomfort but hasn't been having any flare ups to provoke it").

Second, as noted by the ALJ, Sarah reported that medication only "partially" helped with myofascial pain and fatigue. *See* ECF No. 6 at 900. Despite additional treatment with physical therapy, yoga, a walking program, and more, Sarah continued to experience flare-ups of pain, sometimes after a period of increased activity and sometimes with no discernible cause at all. *See, e.g.*, *id.* at 725-27 (November 26, 2022 physical therapy note that "Sarah reports she was doing well until Thanksgiving dinner preparation. Now having increased [left] hip and [left] shoulder pain. . . . [Patient's] ability to continue with [treatment] is encouraging towards her ability to further progress."); *id.* at 773 (December 23, 2022 physical therapy note that "Sarah reports

9

yesterday morning low back had severe sharp pain and spasms on [left] side. She didn't notice any activity that brought things on. Pain was worse as the day went on today."); *id.* at 818 (January 24, 2023 physical therapy note that "Sarah reports she had a [fibromyalgia] flare up starting Saturday, noted somewhat decreased since but feels that she would respond best to low level activities today"); *id.* at 848 (February 17, 2023 physical therapy note that "Sarah reports she had a recent [fibromyalgia] flare up, has not done much recently aside from sleep").

Third, as far as activity levels, Sarah testified that she could take care of her personal needs, make a simple meal most days, sweep her RV, and clean a small bathroom sink, but that she cannot do the dishes because her hips, knees, and back start to hurt and she drops the dishes. ECF No. 6 at 74-75, 77-78. She can no longer knit, something she did successfully for many years, and writing is painful. *Id.* at 74. Her function reports further document that it is difficult for her to put on pants and socks, bathe, moisturize, style her hair, shave her legs, feed herself, or brush her teeth. *Id.* at 286. Complicated cooking is too difficult because it is too much standing, bending, and carrying, and pans full of food are too heavy. *Id.* at 287. She cannot do house or yard work as she has very little strength in her arms and has difficulty bending, crouching, or getting up from a low seat. *Id.* at 331-32.

Sarah self-reported that when she attempts to "tolerate the pain and discomfort and do the work anyway" it puts her in a "flare" and causes her to be "bed bound for a couple days with increased pain." ECF No. 6 at 331; *see also id.* at 632 (June 30, 2022 physical therapy note that Sarah "reports flaring up of her symptoms if she tries a few days of light exercises such as walking less than a mile"). Indeed, she testified that she tried to persevere at work for many years before her symptoms eventually became too much to bear. *Id.* at 63-69. The ALJ cited a few specific activities as evidence that Sarah could do more than she alleged—working on her rental property

10

and helping a friend with plumbing—but ignored that the record also indicates that engaging in these activities increased Sarah's symptoms. *See, e.g.*, *id.* at 461 (June 9, 2022 report that Sarah had been working to paint her rental property to prepare for new tenants and experienced "increased symptoms of fibromyalgia due to increase in movement"); *id.* at 469 (June 14, 2022 report that "Client reported knitting, continuing to paint rental apartment, and continuing to struggle with pain related to fibromyalgia"); *id.* at 480 (August 16, 2022 report that Sarah is "feeling physically sore and tired from helping friend with plumbing job and from two volunteer events"); *id.* at 679 (August 16, 2022 physical therapy note that "she was helping a friend refinish bathroom, knee is not . . . as flared up, but more painful similar to how it was prior to starting PT").

SSR 12-2p specifies that "the symptoms and signs of [fibromyalgia] may vary in severity over time and may even be absent on some days," emphasizing that any consulting examiners should have access to longitudinal information. 2012 WL 3104869, at *5. Sarah's treatment records are consistent with this ebb and flow of pain and fatigue, and the ALJ improperly highlighted only a subset of facts from Sarah's record in order to discount her subjective system testimony, ignoring her lengthy history of treatment and a plethora of evidence corroborating her symptoms. Considering all the evidence in the case record, the ALJ did not articulate substantial evidence to discredit Sarah's subjective testimony regarding the intensity, persistence, and functionally limiting effects of her fibromyalgia symptoms. *See id.*; *Tegan S.*, 546 F. Supp. 3d at 169-70.

## IV.   CONCLUSION

For the reasons detailed above, the Court concludes that the ALJ's evaluation of Sarah's fibromyalgia symptoms and resulting RFC finding are not supported by substantial evidence, 42 U.S.C. § 405(g). Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10)

is GRANTED with remand for further proceedings.    Defendant's Motion to Affirm the Commissioner's Decision (ECF No. 12) is DENIED.    The Clerk shall enter Final Judgment for Plaintiff.


 /s/   Amy E. Moses
AMY E. MOSES
United States Magistrate Judge

May 8, 2026